UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,          Civil Action No. 18-10530

v.                              Magistrate Judge David R. Grand

HUMAYUN KABIR RAHMAN,
f/k/a Md Humayun Kabir Talukder,
a/k/a Ganu Miah, a/k/a Shafi Uddin

                Defendant.
_____/

## AMENDED OPINION AND ORDER DENYING PLAINTIFF'S AND DEFENDANT'S CROSS-MOTIONS FOR SUMMARY JUDGMENT [28, 29]

"[T]he right to acquire American citizenship is a precious one." *See Fedorenko v. United States*, 449 U.S. 490, 505 (1981). It is "the highest hope of civilized men" and it "would be difficult to exaggerate its value and importance." *See Schneiderman v. United States*, 320 U.S. 118, 122 (1943).

In this case, the United States of America has filed a Complaint to Revoke Naturalization of Defendant Humayun Kabir Rahman ("Rahman" or the "Defendant") pursuant to 8 U.S.C. § 1451(a). (ECF No. 1). In short, the government alleges that Rahman procured his naturalization unlawfully, by making materially false statements in his Form N-400 Application for Naturalization and by giving false testimony regarding that application to an immigration officer.

Presently before the Court[1] are the parties' cross-motions for summary judgment on the government's three claims against Rahman: Count I – Illegal Procurement of Naturalization – Lack of Good Moral Character, in violation of 8 U.S.C. § 1427(a)(3); Count II – Illegal Procurement of Naturalization – Not Lawfully Admitted for Permanent Residence (Procured by Fraud or Willful Misrepresentation), in violation of 8 U.S.C. § 1427(a)(1); and Count III – Procurement of United States Citizenship by Concealment of a Material Fact or Willful Misrepresentation, in violation of 8 U.S.C. § 1451(a).  (ECF Nos. 28, 29).

Because of the "value and importance" of U.S. citizenship, the law imposes a stringent, but not insurmountable burden on the government in a "denaturalization" case like this one:  the "evidence justifying revocation of citizenship must be clear, unequivocal, and convincing and not leave the issue in doubt."  *Fedorenko*, 449 U.S. at 505.  For the reasons discussed below, the government failed to satisfy that exacting standard at the summary judgment stage.  However, Rahman also failed to establish his entitlement to summary judgment.  Accordingly, the Court will deny the parties' cross-motions for summary judgment.  (ECF Nos. 28, 29).

---

[1] Pursuant to 28 U.S.C. § 636(c), the parties have consented to the undersigned conducting all proceedings in this case, including trial, the entry of final judgment, and all post-trial proceedings. (ECF No. 7).

## I.      Background

### A.      Operation Janus

On September 8, 2016, the Department of Homeland Security ("DHS"), Office of Inspector General ("OIG"), issued a report titled, "Potentially Ineligible Individuals Have Been Granted U.S. Citizenship Because of Incomplete Fingerprint Records." (ECF No. 37, PageID.962). About a year later, on September 19, 2017, the Department of Justice issued a press release about "Operation Janus," in which the Justice Department initiated civil actions to denaturalize citizens who it believed had procured their naturalized citizenship fraudulently. *United States v. Kahn*, No. 17-965, 2019 WL 764026, at *15 (M.D. Fl. Feb. 21, 2019). The government's instant case against Rahman is one such action.

The government alleges that before he submitted the immigration application that ultimately led to his naturalized citizenship, Rahman had applied for immigration benefits under two different names – "Ganu Miah" and "Shafi Uddin." Due to their respective failures to appear at scheduled immigration hearings, "Miah" was ordered excluded and deported and "Uddin" was ordered deported. Thus, the government claims that Rahman lied in connection with his subsequent application for immigration benefits when he represented that he had never lied to a United States government official while applying for any immigration benefit and that he had never been ordered removed or deported from the United States.

3

The government attempts to prove its case largely through evidence contained in the "A-files"[2] of Rahman, Miah, and Uddin, but it places a heavy, if not principal reliance on Rahman's refusal to answer the government's discovery questions. Indeed, under the heading in its summary judgment motion, "'Ganu Miah,' 'Shafi Uddin,' and 'Humayn Kabir Rahman' Are One and the Same Person," the government leads with the subheading, "Defendant Repeatedly Invoked the Fifth Amendment." (ECF No. 29, PageID.290).

## B.   Ganu Miah, Shafi Uddin and Humayun Kabir Rahman

### i.   *Ganu Miah*

On February 6, 1992, an individual claiming to be "Ganu Miah" arrived in the United States aboard British Airways flight 177 from London to New York. (ECF No. 29, PageID.285; ECF No. 29-3, PageID.321). Miah presented an altered Bangladeshi passport bearing the name "Md Jashim Uddin." (ECF No. 29-5, PageID.326). Immigration officers paroled Miah into the United States until June of 1992, for the purpose of applying for asylum. (ECF No. 29-3, PageID.321). Miah submitted a Form I-589, Request for Asylum along with a full set of fingerprints. (ECF No. 29-8, PageID.341-343). Miah was interviewed in connection with his

---

[2] Caroline Nguyen of the U.S. Citizenship and Immigration Services ("USCIS"), Department of Homeland Security, testified during her deposition that an "A-file" contains the "applicant's immigration history . . . [a]ny type of forms or applications that he applied for." (ECF No. 1-1, PageID.22; No. 34-4, PageID.922).

asylum application, but that application was not granted.  (ECF No. ECF No. 29-7; No. 29-9).  In addition, despite being personally served with a Form I-22 Notice to Applicant Detained/Deferred for hearing Before Immigration Judge, charging Miah with being excludable from the United States under 8 U.S.C. § 1182(a)(7)(A)(i)(I) for not having a valid, unexpired immigrant visa, Miah failed to appear in immigration court on that matter.  (*Id*.)  An immigration judge ordered that he "be excluded and deported" from the United States.  (ECF No. 29-10).

### ii.    *Shafi Uddin*

On October 11, 1994, a person claiming to be "Shafi Uddin" filed a Form I-589, Request for Asylum along with a full set of fingerprints and a photograph dated September 27, 1994.  (ECF No. 29-11-14).  He stated that he never used any other names.  (*Id*.).  However, in an interview with immigration officials on September 13, 1995, he stated under oath that he entered the United States on July 16, 1994, with a passport bearing the name "Syed Ali."  (ECF No. 29-14).  Despite being personally served on September 27, 1995, with an Order to Show Cause and Notice of Hearing charging Uddin with deportability under 8 U.S.C. § 231(a)(1)(A), he failed to appear in immigration court on that matter on April 8, 1997, and was ordered deported.  (ECF No. 29-17).

### iii.    *Defendant Humayun Kabir Rahman, f/k/a Md Humayun Kabir Talukder*

On October 6, 1997, the Defendant – whose legal name at the time was Md

Humayun Kabir Talukder – submitted Form DS-230, Parts I and II and supplemental registration (collectively, "Form DS-230") to the U.S. Department of State's National Visa Center.  (ECF No. 29-18).  He indicated that his name was "Md Humayun Kabir Talukder," and that he had never used any other names, had never attempted to enter the United States illegally, and had never been denied admission to the United States.  (ECF No. 29-18).[3]  "Talukder's" visa application was ultimately granted, and he thereafter submitted a Form I-485, Application to Register Permanent Residence or Adjust Status ("Form I-485"), along with a full set of fingerprints, dated November 1, 1997.  (ECF Nos. 29-19-20).  On the Form I-485, Defendant again stated under oath that his name was "Md Humayun Kabir Talukder," that he was not facing exclusion or deportation, and that he had never sought to procure (or actually procured) a visa, entry in to the United States, or any other immigration benefit, through fraud or willful misrepresentation of a material fact.  (ECF No. 29-19).  In a separate Form G-325A he submitted the same day, Defendant also represented that he had never used any other names.  (ECF No. 29-21).  During an April 27, 1998 interview, he represented that he entered the United States at Buffalo, New York, in the back of a car without inspection.  (ECF No. 29-22, PageID.442, 470-72; *see also* ECF No. 29-19, PageID.389).  On July 28, 1998,

---

[3] Although the first page of this exhibit – the DV 1998 Immigrant Visa Registration Form – spells the applicant's last name "Talukder," in the other forms comprising this exhibit, his last name is spelled "Talukdar."  (*Id.*).  Neither party raises this discrepancy as an issue.

"Talukder's" application was approved, according him permanent resident status. (ECF No. 29-19).   A few weeks later, Defendant submitted photographs and fingerprints to be used in preparing his permanent resident card.  (ECF No. 29-22, PageID.454-458; No. 29-29).

About five years later, on August 15, 2003, Defendant – still named Md Humayun Kabir Talukder – applied to become a naturalized United States citizen by submitting Form N-400, Application for Naturalization ("Form N-400") to USCIS. (ECF No. 29-32-33).  In response to Form N-400's question: "If you have ever used other names, provide them below," Defendant wrote "N/A."  (*Id.*, PageID.507).  He marked "No" in response to a series of questions about his past, including: "Have you **EVER** given false or misleading information to any U.S. government official while applying for any immigration benefit or to prevent deportation, exclusion, or removal?"; "Have you **EVER** lied to any U.S. government official to gain entry or admission into the United States?"; "Have you **EVER** been ordered to be removed, excluded, or deported from the United States?"; and "Have you **EVER** applied for any kind of relief from removal, exclusion, or deportation?"  (*Id.*, PageID.514-15) (emphasis in original).   Defendant signed Form N-400 under penalty of perjury, attesting that his answers were true and correct.  (*Id.*, PageID.516)  He also submitted a set of fingerprints with the application.  (ECF No. 29-20).[4]

---

[4] The government mistakenly cites these fingerprints as ECF No. 29-59, but that is merely a

On May 24, 2004, Defendant was interviewed under oath by a USCIS officer, and he provided testimony consistent with his answers to the written questions described in the preceding paragraph. (ECF No. 29-34, PageID.565; ECF No. 29-51, PageID.674). Defendant's application for naturalization was approved that same day, and he was set to become naturalized on June 14, 2004. (ECF No. 29-52, PageID.722-24). Also on May 24, 2004, Defendant submitted a petition to change his name from "Md Humayn Kabir Talukder" to "Humayn Kabir Rahman." (*Id.*). That petition was granted on June 14, 2004, and a Certificate of Naturalization was issued to Defendant in the name of "Humayun Kabir Rahman" on that date. (*Id.*).

The government now contends that Rahman, Miah and Uddin are the same person. In other words, the government contends that before Rahman submitted his Form DS-230 and naturalization paperwork in the name of "Md Humayun Kabir Talukder," he had submitted asylum applications in the names of Ganu Miah and Shafi Uddin. Thus, the government contends that when Rahman applied for naturalization, his representations that he had (1) never lied to a United States government official while applying for any immigration benefit, and (2) never been ordered removed or deported from the United States, were untrue, and that he therefore procured his naturalization by fraud, willful misrepresentation, and/or concealment of a material fact, in violation of above-referenced "denaturalization"

_____

document which references the fingerprints in question.

statutes.

### C.    The Government's Evidence that Rahman, Miah, and Uddin Are the Same Person

#### i.    *Fingerprints*

The government attached to its summary judgment motion various sets of fingerprints of Miah, Uddin, and Rahman, which came from their respective A-Files. (*e.g.*, ECF No. 29-8, PageID.342 (Miah); ECF No. 29-13, PageID.357 (Uddin); ECF No. 29-20, PageID.395(Rahman).)  Timothy H. Wagner, a fingerprint analyst at the Homeland Security Investigations Forensic Laboratory, produced an expert report in which he opined that, based on a friction ridge detail comparative examination, the fingerprints associated with Miah, Uddin, and Talukder (Rahman) "were made by the same individual." (ECF. No. 29-59, PageID.775).  In a second report, Wagner opined that two additional fingerprints from Talukder's (Rahman's) permanent resident card and naturalization application and Miah's fingerprint card "were made by the same individual."  (ECF No. 29-60, PageID.777).

Rahman does not challenge Wagner's methods or conclusions.  Instead, he argues that the government did not sufficiently prove a proper chain of custody with regard to the fingerprints and that the fingerprint cards are unreliable.  (ECF No. 28, PageID.210-14; ECF No. 32, PageID.822-23; ECF No. 39, PageID.995-96).

#### ii.    *Information from Applications in the A-Files*

In support of its contentions that Rahman, Miah and Uddin are the same

person, the government also points to certain information in their various A-File forms that are the same.

### a. 1430 Parkchester Rd.

In his Form N-400, Rahman indicated that he resided at 1430 Parkchester Rd, #5E, Bronx, NY 10462, from at least July 1998 until November 1998.  (ECF No. 29-55, PageID.743).   In the Form G-325A accompanying his application for permanent residence, Rahman indicated that he resided at that same address from March 1996 until the "present time," *i.e.*, November 1997.

Numerous documents in Shafi Uddin's A-File identify Uddin as living at the same Parkchester address.  For example, Uddin listed 1430 Parkchester Rd, #5E, Bronx, NY 10462 as his address on a fingerprint card dated September 27, 1994.  (ECF No. 29-13).  Other documents associated with Uddin's immigration case listed that same address as his residence.  (ECF No. 29-62; ECF No. 29-63).

### b. 1314 Virginia Ave.

On his Form DS-230, signed on October 1, 1997, Rahman indicated that his sponsor was "Sufian Uddin," and that her address was 1314 Virginia Ave., #5B, Bronx NY 10462.  (ECF No. 29-18, PageID.380.)  In his immigration paperwork, Ganu Miah listed this same address as his place of residence upon his arrival in February 1992 and on an August 1996 court form that he signed.  (ECF No. 29-3; ECF No. 29-4; ECF No. 29-64).

### c. Other Information

Other information in the A-Files also suggests a link between Rahman, Miah, and Uddin.  In his Application for Immigrant Visa and Alien Registration, Rahman identified his father as "MD – Abdur Rahman Talukdar" and his mother as "Jairun Begum Talukdar."  (ECF No. 29-18, PageID.383).  He indicated that he was born in Dhubil Raygonj, Bangladesh, but that he had lived in Sylhet, Bangladesh virtually his entire life.  (*Id.*, PageID.375, 383).

When Ganu Miah first arrived in the United States, he was interviewed, and, according to the transcript of that interview, he indicated that he was born in Sylhet, Bangladesh, and that his mother's name was "Joyrun."  (ECF No. 29-4, PageID.323).  In a form completed a few years later, Miah indicated that his mother's name was "Joirun."  (ECF No. 29-7, PageID.335).

In a Request for Asylum form submitted by "Shafi Uddin," he indicated that he was born in Sylhet, Bangladesh.  (ECF No. 29-11, PageID.349).  In his Form G-325A – Biographic Information, submitted the same date, Uddin indicated that his mother's name was "Joyrun" and his father's name was "Abdul Rahman."  (ECF No. 29-14).  The President of the Jatiyo Party submitted a letter supporting "Uddin's" asylum application, in which he wrote that Uddin was the "son of Mr. Abdul Rahman . . ."  (ECF No. 29-65).

### iii.   Photographs

The government's summary judgment motion is supported in part by an expert report of Kimberley A. Meline, an examiner with the Forensic Audio, Video, and Image Analysis Unit, Operational Technology Division, Federal Bureau of Investigation.   (ECF No. 785).   In her report, Meline compares a variety of photographs of Miah and Uddin against photographs of Rahman, with the photos covering various periods of time.   The photos compared included those submitted as part of: (1) Miah's asylum application (ECF No. 29-7, PageID.337); (2) Rahman's diversity visa and adjustment of status applications (ECF No 29-18, PageID.375; No. 29-19, PageID.387); (3) Uddin's fingerprint card (ECF No. 29-13); (4) the letter of support for from the Jatiyo party submitted in support of Uddin's asylum application (ECF No. 29-65); and (5) two photos of Miah and Uddin from a New York State Department of Motor Vehicles database.   (ECF No. 29-57, PageID.761-62).

Meline selected images from Rahman, Miah, and Uddin to compare, and then processed the images electronically to create Rahman/Miah and Rahman/Uddin "comparison charts."   (ECF No. 29-61, PageID.785).   Ultimately, Meline opines that based on her review of the comparison charts, Rahman and Uddin and Rahman and Miah "share multiple facial features, including the overall shape of the face, the shape of the profile, hairline, eyes, eyebrows, nose, lips, chin, and specific structures

12

in the ears.  These similarities lend strong support" for Rahman and Miah "being the same individual" and Rahman and Uddin "being the same individual."  (*Id.*).

Rahman does not challenge Meline's conclusions, but claims the photographs she used have an unreliable foundation and, at any rate, that Meline "never states that they are conclusively the same person."  (EFC No. 32, PageID.822-23).

## iv.     *Rahman's Invocation of the Fifth Amendment*

During discovery, Rahman refused to answer certain of the government's interrogatories and deposition questions on the grounds that compelling him to provide answers would violate his Fifth Amendment rights against self-incrimination.  Rahman refused to answer the following interrogatories:

1. Identify all names and aliases that you have used for any purpose at any time.

2. Identify [] all persons who assisted you in any capacity in preparing, completing, or filing all requests, petitions, and applications for immigration benefits or changes in immigration status in the United States or to enter the United States . . .

4. Identify [] the date and location of your first entry into the United States.

8. State and describe in detail each occurrence where you have given false or misleading information to any official of the United States government while applying for any immigration benefit or to prevent deportation, exclusion, or removal.

9. Have you ever lied to any United States government official to gain entry or admission to the United States, or to naturalize as a United States citizen?

10.Identify which, if any, of the following photographs are of you . . .

(ECF No. 29-58).

At his deposition, Rahman refused to answer many of the government's questions, including:

- "Other than your current name, Humayun Kabir Rahman, and your former name, MD Humayun Kabir Talukder, have you ever used any other names?"

- "Have you ever given false or misleading information to any U.S. government official while applying for any immigration benefit or to prevent deportation, exclusion or removal?"

- "Have you ever lied to any U.S. government official to gain entry or admission into the United States?"

- "Have you ever been in removal, exclusion or deportation proceedings?"

- "Have you ever been ordered to be removed, excluded or deported?"

- "Have you ever applied for any kind of relief from removal, exclusion or deportation to include asylum regardless of whether it was applied for during removal, exclusion or deportation proceedings?"

- "[Showing Rahman his Form I-485] . . . there's a box that says current INS status and typed into the box it says EWI.  Did you, in fact, enter the United States without being inspected?"

- "Was March 19, 1996 the date that you first arrived in the United States?"

- "Have you ever had a driver's license issued by the State of New York in any name?"

(ECF No. 29-52, PageID.695-700).

In addition, Rahman was shown numerous photographs – some of which were on documents such as passports, immigration documents, and New York Department of Motor Vehicle cards – in the name of other individuals, including Shafi Uddin and Ganu Miah – and asked if he was the individual pictured.  (*Id.*, PageID.704-707; ECF No. 29-56, PageID.753-54; ECF No. 29-57).  Again, in each instance, Rahman asserted his Fifth Amendment right and refused to answer.

## II.    Legal Standards

### A.    Summary Judgment

Pursuant to Rule 56, the Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Pittman v. Cuyahoga County Dep't of Children & Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011).  A fact is material if it might affect the outcome of the case under governing law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material fact exists, the Court assumes the truth of the non-moving party's evidence, and construes all reasonable inferences from that evidence in the light most favorable to the non-moving party.  *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006).

Additionally, a moving party with the burden of persuasion who seeks summary judgment – here, the United States – faces a "substantially higher hurdle."

15

*Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002).  The evidentiary showing must be so strong as to convince the Court that "no reasonable trier of fact could find other than for [the moving party]."  *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986).  The party with the burden of proof "must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it."  *Arnett*, 281 F.3d at 561.  "Accordingly, summary judgment in favor of the party with the burden of persuasion 'is inappropriate when the evidence is susceptible to different interpretations or inferences by the trier of fact.'"  *Green v. Tudor*, 685 F. Supp. 2d 678, 685 (W.D. Mich. 2010) (quoting *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999)).

## B.    Denaturalization

The law under which the government brings this case, 8 U.S.C. §1451(a), provides:

> It shall be the duty of the United States attorneys for the respective districts, upon affidavit showing good cause therefor, to institute proceedings in any district court of the United States in the judicial district in which the naturalized citizen may reside at the time of bringing suit, for the purpose of revoking and setting aside the order admitting such person to citizenship and ***canceling the certificate of naturalization on the ground that such order and certificate of naturalization were illegally procured or were procured by concealment of a material fact or by willful misrepresentation***, and such revocation and setting aside of the order admitting such person to citizenship and such cancelling of certificate of naturalization shall be effective as of the original date of the order and certificate, respectively.

8 U.S.C. §1415(a)(emphasis added).

Under this provision, there are thus two grounds on which the government may institute denaturalization proceedings:  (1) where naturalization was "illegally procured"; and (2) where naturalization was "procured by concealment of a material fact or by willful misrepresentation."  *Id.*  The result of  denaturalization is revocation of citizenship.  *See id.*  The United States Supreme Court has stated that, despite this very tangible and significant consequence of denaturalization, "there must be strict compliance with all the congressionally imposed prerequisites of citizenship."  *Fedorenko v. U.S.*, 449 U.S. 490, 506 (1981).  If the government satisfies its heavy burden of proving that citizenship was procured illegally, this Court lacks the ability to "refrain from entering a judgment of denaturalization."  *Id.* at 517.

In denaturalization proceedings, the government has the burden of proving that citizenship should be revoked by submitting "clear, unequivocal, and convincing" evidence that does not leave the issue in doubt.  *Fedorenko*, 449 U.S. at 505.  "[A]lthough the government bears a heavy burden in denaturalization proceedings, the facts of a case may be such that revocation of citizenship at the summary judgment stage may be appropriate."  *United States v. Dailide,* 227 F.3d 385, 389 (6th Cir. 2000).  Indeed, courts require "strict compliance with all the congressionally imposed prerequisites to the acquisition of citizenship."  *Fedorenko*,

449 U.S. at 506.  These two competing factors – the government's exacting burden of proof, and the naturalized citizen's obligation to have strictly complied with citizenship prerequisites – combine to "reflect our consistent recognition of the importance of the issues at stake—for the citizen as well as the Government—in a denaturalization proceeding."  *Id.* at 507.  Still, "[t]he rules of summary judgment are no different when applied in a denaturalization proceeding than in any other civil case."  *United States v. Son*, No. CIVA08-CV-11025-RGS, 2010 WL 1460230, at *2 n.2 (D. Mass. Apr. 13, 2010).

### C.    Privilege against Self-Incrimination

The Fifth Amendment to the United States Constitution provides that "[n]o person shall be ... compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.  The Fifth Amendment privilege against self-incrimination "not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also privileges him not to answer questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings."  *In re Morganroth*, 718 F.2d 161, 164-65 (6th Cir. 1983) (citing *Lefkowitz v. Turley*, 414 U.S. 70, 94 (1973)).  To properly invoke the privilege, one must "'demonstrate a real danger of incrimination[,]'" *see United States v. Conces*, 507 F.3d 1028, 1040 (6th Cir. 2007) (quoting *Brennan v. C.I.R.*, 752 F.2d 187, 189 (6th Cir. 1984)), "and not

18

a mere imaginary, remote or speculative possibility of prosecution." *Morganroth*, 718 F.2d at 167.  A "blanket assertion" of the privilege is not permissible. *Id.* "The privilege must be asserted by a witness with respect to particular questions, and in each instance, the court must determine the propriety of the refusal to testify." *Id.* The Fifth Amendment's protection against self-incrimination "'does not extend to consequences of a noncriminal nature, such as threats of liability in civil suits.'" *Conces*, 507 F.3d at 1040 (quoting *United States v. Apfelbaum*, 445 U.S. 115, 125 (1980)).  Instead, the witness must "risk[ ] a real danger of prosecution" in that "an answer to a question, on its face, calls for the admission of a crime or requires that the witness supply evidence of a necessary element of a crime or furnishes a link in the chain of evidence needed to prosecute." *In re Morganroth*, 718 F.2d at 167. "[A] real danger of prosecution also exists where questions, which appear on their face to call only for innocent answers, are dangerous in light of other facts already developed." *Id.* (citing *Hoffman v. United States*, 341 U.S. 479, 486-88 (1951)).

One of the principal disputes in this case concerns the impact of Rahman's invocation of the Fifth Amendment in response to the government's discovery questions.  A proper understanding of the Fifth Amendment's application to this particular case is therefore crucial, and requires an extensive analysis.  In the end, that analysis shows that both sides' arguments on the issue are flawed.

First, serious questions exist about whether Rahman could properly invoke

the Fifth Amendment.  "[T]he risk that [a denaturalization defendant's] testimony might subject him to deportation is not a sufficient ground for asserting the privilege, given the civil character of a deportation proceeding," *see United States v. Balsys*, 524 U.S. 666, 671 (1998) (citing *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1038–1039 (1984)), and Rahman does not specifically claim that he invoked his Fifth Amendment right due to a fear that he could face *criminal prosecution* as a result of his answers.  Indeed, because the statute of limitations for the crime of making a false statement to an immigration officer is ten years, *see* 18 U.S.C. §§ 1425(a), 3291, it would seem that, at least with respect to the alleged conduct at the heart of this case, Rahman could not be prosecuted for having given false statements in connection with his immigration and naturalization applications.  *See Balsys*, 524 U.S. at 671–72; *id.*, n.1 (1998) (noting that, due to the statute of limitations' expiration, the defendant in a deportation case was not claiming his testimony could be used in a subsequent federal criminal proceeding, but rather, that it "could be used against him by Lithuania or Israel in a criminal prosecution.").  *See also Hardin v. Carcara*, No. CV 02-443-C, 2006 WL 8456549, at *2 (W.D. Ky. Jan. 23, 2006) ("Because the Fifth Amendment prohibits the witness from being convicted out of his own mouth, [defendant] cannot be compelled to name the informant unless he is granted immunity from a perjury prosecution, **or until the running of the applicable statute of limitations**.") (emphasis added).  The government, however,

does not specifically challenge Rahman's ability to invoke his Fifth Amendment right, and instead simply asks the Court to find that his refusal to answer the questions (1) precludes him from offering evidence to rebut the government's proofs, and (2) warrants the imposition of an adverse inference that is itself affirmative evidence that his truthful answers would have supported the government's claims – in particular, its claim that Rahman, Miah, and Uddin "are one and the same person." (ECF No. 29, PageID.290). Thus, at least for purposes of this summary judgment motion, the Court does not decide whether Rahman had a right to invoke the Fifth Amendment in response to the government's discovery questions. However, contrary to Rahman's argument, even assuming he had such a right, that does not mean his decision to exercise that right is without consequence in this denaturalization case.

"The normal rule in a criminal case permits no negative inference from a defendant's failure to testify." *Mitchell v. United States*, 526 U.S. 314, 315 (1999) (citing *Griffin v. California*, 380 U.S. 609, 614 (1965)). However, where a litigant invokes the Fifth Amendment in a civil case – even one in which an adverse judgment may arguably have longer-lasting and more severe consequences than a prison sentence – his decision to do so may carry adverse consequences in terms of his defense of the litigation. First, in a civil case, once a litigant invokes the Fifth Amendment privilege on an issue, he is barred from introducing other evidence on

that issue.  *See Dunkin' Donuts, Inc. v. Taseski*, 47 F. Supp. 2d 867, 872-73 (E.D. Mich. 1999).   In other words, he may not use the Fifth Amendment during a deposition, and then submit "affidavits in opposition to the government's motion for summary judgment" as to issues about which he refused to answer.  *See id.* (quoting *U.S. v. Sixty Thousand Dollars in U.S. Currency*, 763 F. Supp. 909, 914 (E.D. Mich. 1991)).

Second, as the government notes, "[a] litigant may not invoke the Fifth Amendment to avoid answering questions in discovery, and then cry foul when the absence of evidence in favor of the litigant requires summary judgment to be entered against him."  (ECF No. 29, PageID.297) (quoting *United States v. $110,873.00 in U.S. Currency*, 159 Fed. Appx. 649, 652-53 (6th Cir. 2005)).  "Choosing to remain silent is 'a perfectly constitutional option but one that he may not leverage into a basis for avoiding the requirements of Rule 56.'"  *See id*.

Third, "[t]he Supreme Court has held that a negative inference can be drawn from a failure to testify in civil proceedings, and that drawing such an inference violates neither the Fifth Amendment nor Due Process."  *See Hoxie v. Drug Enforcement Admin.*, 419 F.3d 477, 483 (6th Cir. 2005) (citing *Baxter v. Palmigiano*, 425 U.S. 308, 318-19 (1976)).  *See also United States v. Lileikis*, 929 F. Supp. 31, 37 (D. Mass. 1996) (holding that denaturalization defendant's refusal to answer specific questions "creates a compelling inference that the Government's allegations

22

against [him] are true.").

Perhaps recognizing that none of these general principles bode well for Rahman, he argues that "his invocation of the 5th Amendment should not be considered adversely against him" because, in bringing this *civil* case, the government is purportedly seeking to "punish" him. As his counsel argued at the hearing on the parties' cross-motions for summary judgment:

> Operation Janus is different. Operation Janus I think is a punishment given what has been said in the Press [] [and] the Press Release for this case . . . There is a specific group of people that were looked at, and I think given all that surrounding Press, media statements made by this Administration, that this is not like the other denaturalization cases that have happened years ago. This is punishment.

(ECF No. 39, PageID.1008).

However, the law in denaturalization cases is simply to the contrary. Regardless of how the "Administration" may characterize its efforts to identify past immigration fraud, the law makes clear that actions brought under 8 U.S.C. § 1451(a) are civil actions, and that any consequences that flow from the adjudication of those actions, while potentially severe, are not "punishment." *See Johannessen*, 225 U.S. 227, 242–45 (1912); *Trop v. Dulles*, 356 U.S. 86, 98–99 (1958). In the seminal case of *Johannessen*, decided shortly after the enactment of the Naturalization Act of 1906, the Supreme Court considered the claims of a naturalized citizen facing cancellation of his naturalization certificate on the ground

that it had been "fraudulently and illegally procured." *Johannessen*, 225 U.S. at 232. The person argued that the denaturalization provision, if applied retroactively, would be void as an *ex post facto* law in violation of the Constitution. *Id.* at 242. The Court rejected that argument based on the well-settled rule that the constitutional prohibition of *ex post facto* laws "is confined to laws respecting criminal punishments." *Id.* at 242. The Court acknowledged the prohibition does not apply to the denaturalization provision, which merely deprives the alien "of a privilege that was never rightfully his" and "**imposes no punishment** upon an alien who has previously procured a certificate of citizenship by fraud or other illegal conduct." *Id.* (emphasis added). *See also, e.g., United States v. Borgono*, No. 18-21835-CIV, 2019 WL 2436279, at \*3 (S.D. Fla. June 11, 2019) ("a denaturalization case constitutes a civil proceeding and every court that has considered this question has repeatedly held that 'denaturalization is civil and equitable in nature'") (citations omitted); *Fedorenko*, 449 U.S. at 516 ("[A] denaturalization action is a suit in equity") (citations omitted). In sum, nothing about the nature of this denaturalization case precludes the Court from drawing an adverse inference from Rahman's invocation of the Fifth Amendment in response to the government's *salient* discovery questions.

Ample case law further supports this conclusion. The Court starts its analysis with the Sixth Circuit case of *Hoxie v. Drug Enforcement Admin.*, 419 F.3d 477 (6th

Cir. 2005), both because it provides a cogent example of the "adverse inference" principle, and because it specifically recognizes the appropriateness of applying that principle "in the immigration context."

In *Hoxie*, Dr. Hoxie had received a DEA certificate of registration to dispense prescription drugs in 1995.  On his application for that certificate, Dr. Hoxie answered "no" when asked if he had "ever been convicted of a crime in connection with controlled substances . . ."  Years later, the DEA found arrest records which indicated that in 1983, Dr. Hoxie had, by plea of *nolo contendere*, been convicted of a drug offense in California.  When DEA agents visited Dr. Hoxie to ask him about the arrest records, he denied the records related to him and insisted he had never been convicted of a drug offense.

An administrative hearing was held, and the DEA presented the arrest records as well as investigator testimony about conversations he had with the California Department of Justice custodian of records, who confirmed Dr. Hoxie's *nolo* plea and that "a criminal background check of Dr. Hoxie revealed arrests and convictions in California."  Dr. Hoxie cross-examined the witnesses, but presented no evidence in his defense.  The ALJ found that the DEA had established, by a preponderance of the evidence, that Dr. Hoxie had been convicted of a controlled substance offense, and that his contrary subsequent statement in his DEA application was false. Accordingly, the ALJ recommended revoking Dr. Hoxie's DEA certificate.  The

DEA Deputy Administrator upheld the ALJ's recommendation.  In addition to citing evidence about Dr. Hoxie's conviction, the Deputy Administrator relied on Dr. Hoxie's "failure to testify at the hearing."

Dr. Hoxie appealed the decision to revoke his DEA certificate, and specifically argued that, "the negative inference drawn from his failure to testify is 'fundamentally unfair.'"  *Id.* at 483.  The Sixth Circuit rejected that argument, and held that Dr. Hoxie's refusal to testify was affirmative "evidence" on which the DEA and the ALJ could rely in concluding that Dr. Hoxie had materially falsified his application:

> The Supreme Court has held that a negative inference can be drawn from a failure to testify in civil proceedings, and that drawing such an inference violates neither the Fifth Amendment nor Due Process.  *Baxter v. Palmigiano*, 425 U.S. 308, 318–19 [] (1976).  The Supreme Court has also commented in other contexts that silence can be evidence of a negative inference.  In *United States v. Hale*, 422 U.S. 171, 176 [] (1975), the Court noted that "[s]ilence gains more probative weight where it persists in the face of accusation, since it is assumed in such circumstances that the accused would be more likely than not to dispute an untrue accusation."  And **the Supreme Court has repeatedly explained in the immigration context that "[s]ilence is often evidence of the most persuasive character.  ...  [There] is no rule of law which prohibits officers charged with the administration of the immigration law from drawing an inference from the silence of one who is called upon to speak.**"  *INS. v. Lopez–Mendoza*, 468 U.S. 1032, 1043–44 [] (1984) (quoting *United States ex rel. Bilokumsky v. Tod*, 263 U.S. 149, 153–54 [] (1923)).  In the particular context of an administrative hearing, an agency adjudicator's reliance on silence as evidence has been upheld.  *See Anderson v. Dep't of Transp.*, 827 F.2d 1564, 1572–73 (Fed. Cir. 1987).  Therefore, **Dr. Hoxie's silence was *evidence* on which the**

26

**DEA could rely to conclude that Dr. Hoxie materially falsified his application** and that his actions rendered his continued registration inconsistent with the public interest.

*Hoxie*, 419 U.S. at 483 (emphasis added).

*Hoxie's* reasoning is important to Rahman's case in two respects. First, it confirms the general principle that in a civil action brought by the government where the defendant faces potentially severe, but non-criminal consequences, his refusal to testify constitutes "evidence" that the adjudicator can consider in passing on the merits of the case. Second, citing the U.S. Supreme Court's decision in *Lopez-Mendoza*, the *Hoxie* court highlighted that this principle is "repeatedly" applied in non-criminal immigration cases, like Rahman's.

The closest case to Rahman's that the Court was able to locate is *United States v. Son*, No. CIVA08-CV-11025-RGS, 2010 WL 1460230, at *3 (D. Mass. Apr. 13, 2010). In that case, Son was a Korean national who, in May 1993, was granted lawful permanent resident ("LPR") status when he was about twenty years old. Son's father had received his LPR status a few months earlier based on his being a "Priority Worker – Certain Multinational Executive or Manager." According to Son's green card, his LPR status was based on him being a child of a "Professional Holding an Advanced Degree or Exceptional Ability."[5] In other words, Son's LPR

---

[5] About a year later, Son's mother was granted LPR status on account of her spousal relationship to Son's father.

status was a direct result of his father first obtaining LPR status.  About seven years later, Son applied for and was granted naturalization.

It turned out that Son's father's green card was issued illegally.  Specifically, Son's father had paid a bribe to an INS official for its issuance.  In May 2003, removal proceedings were instituted against Son's father and mother, and the removal charges were ultimately sustained.  The United States then filed an action in federal court, like this one, to revoke and set aside the grant of United States citizenship to Son.  As the district court explained, "Son became an LPR based on his relationship to his father [].  However, because [his father] had paid an illegal bribe to obtain LPR status, he was an unlawful resident of the United States, and as Son's status was dependent on [his father's] status, he too was unlawfully classified as a permanent resident."  *Id.* at *2.

Son had even greater evidentiary challenges to the government's case against him than does Rahman.  The INS official who took the bribe from Son's father had kept the illegal A-files at his home.  Although he had maintained a list of the illegal A-files, he burned the A-files themselves.  Son argued that, without the A-files, he had "no legal way to defend himself in this case . . ."  *Id.* at *3.  In an apparent move to capitalize on the destroyed A-files, Son invoked his Fifth Amendment right and refused to answer the government's deposition questions about how he obtained his green card.  Most notably, he refused to answer when asked "whether he was aware

28

that his green card was obtained unlawfully." *Id.*

In granting the government's motion for summary judgment, the district court noted, "[i]n a civil proceeding—which this is—an adverse inference may properly be drawn from a party's invocation of the privilege against self-incrimination." *Id.* at *3 n.5. The court then explained, "Son's argument ultimately is one not cobbled up from facts, but from conjecture and speculation, and based on the erroneous assumption that on summary judgment the government in a denaturalization proceeding is required to disprove every negative hypothesis beyond a reasonable doubt (or as his counsel stated at oral argument, 'nearly so'). Son has not shown that he would have access to any pertinent information in the Afile, even were it to be located." *Id.* at *3.

As in *Son*, the Court finds that, to the extent Rahman refused to answer the government's *salient* questions, the Court may draw an adverse inference against him, and treat that adverse inference as affirmative evidence supporting the government's motion. Of course, as discussed below, the contours of the specific questions asked by the government play a significant role in determining what, if any, adverse inference the Court may draw. Before turning to that specific issue, however, the Court addresses Rahman's other arguments against imposing an adverse inference, generally, in denaturalization cases. Indeed, the second of those arguments helps cabin the extent to which the Court can draw an adverse inference

in this case.

Rahman's first argument – that the imposition of adverse inferences in denaturalization cases has been limited to cases in which the defendant was a former Nazi – gets him nowhere.  (ECF No. 39, PageID.1008).  The defendant in *Son* had no Nazi affiliation, and the court still applied an adverse inference.  Moreover, while it is true that the adverse inference principle has arisen in cases involving former Nazis, *see e.g.*, *U.S. v. Bartesch*, 643 F.Supp. 427 (N.D. Ill. 1986) ("the Court will draw an adverse inference from defendant's failure to testify, based on a continued assertion of his Fifth Amendment privilege, and may use the adverse inference in defendant's denaturalization proceedings."); *U.S. v. Stelmokas*, 1995 WL 464264, at *7 (E.D. Pa. Aug. 2, 1995), nothing in those cases suggests that the courts deemed the defendants' backgrounds to be relevant considerations.

Rahman's second argument – that he "is not barred from presenting evidence about what occurred at the immigration interviews and the addresses he resided at and with whom" – is a little more helpful to his cause, but in a roundabout way. (ECF No. 32, PageID.825).  Rahman relies principally on *Traficant v. C.I.R.*, 884 F.2d 258 (6th Cir. 1989), which dealt with a trial court's ability to limit the evidence a litigant could introduce at trial after he had asserted his Fifth Amendment right and refused to testify.

In *Traficant*, a politician had been charged with bribery.  He was acquitted,

but then faced a civil action brought by the IRS, alleging that his failure to report the bribes as income resulted in a fraudulent underpayment of his income taxes in violation of 26 U.S.C. § 6653(b).  The government's evidence included audio tapes of Traficant accepting funds the government alleged were bribes and a signed statement Traficant had given to authorities.  During discovery, the government asked Traficant questions "about the authenticity" of that evidence.  Traficant refused to answer the government's questions, and the trial court ruled that because he had invoked that right, it would "limit" his ability to explore "not only the authenticity of the [] evidence but also [] the very contents and significance of those exhibits . . ."  The Sixth Circuit explained that this went too far because "once he had invoked the privilege against self-incrimination on the authenticity of the statement and the tapes, [the court could only bar Traficant] from introducing other evidence on *that matter*."  *Traficant*, 884 F.2d at 265 (emphasis in original).  The court went on to say, (1) "[s]uch limits are properly within the scope of cases holding that a party to civil litigation or other non-criminal proceedings may encounter costs imposed in exchange for the assertion of the Fifth Amendment privilege as long as they are not so high as to force abandonment of the privilege," and (2) "when the issue is whether a court may impose broad limits on the admissibility of evidence, the cases permit only limits ***directly related to*** the scope of the asserted privilege."  *Id.* (emphasis added).

31

While Rahman seizes on these two statements in the *Traficant* decision, they are only of marginal assistance to him.  First, the statements do not at all undermine the Court's conclusion that even in a denaturalization case, where the costs of invoking the Fifth Amendment may be loss of citizenship, it may draw an adverse inference from the defendant's refusal to testify.  Second, the quoted sentences speak to a situation where the defendant asserts his Fifth Amendment right and then tries to *admit his own evidence* as to a related issue.  Here, though, Rahman admits that he offers no evidence of his own.  (ECF No. 32, PageID.825-26).  His argument that he was not required to do so because the government "has not met its high burden . . ." misconstrues the case's current procedural posture – where the government has presented the Court with the evidence discussed above, *see supra* at 9-13 – and is akin to the argument Son made, which the court rejected as being "one not cobbled up from facts, but from conjecture and speculation, and based on the erroneous assumption that on summary judgment the government in a denaturalization proceeding is required to disprove every negative hypothesis beyond a reasonable doubt . . ."  *Son*, 2010 WL 1460230, at *3.

Rahman's argument would only potentially have merit if the government had no evidence against him.  Numerous courts have held that if the only evidence one party would have against the other is his refusal to testify, then it would not be appropriate to apply an adverse inference based on the refusal to testify.  Indeed, the

principal case relied on by the *Traficant* court, *Spevack v. Klein*, 385 U.S. 511, 515 (1967), makes this clear.  In *Spevack*, an attorney received a subpoena and refused to comply on the basis that it would tend to incriminate him.  For no other reason than his invocation of his Fifth Amendment rights, the New York Supreme Court Appellate Division ordered him disbarred, "holding that the constitutional privilege against self-incrimination was not available to him . . ." *Id.* at 513.  Ultimately, the U.S. Supreme Court reversed, holding that the attorney had a right to invoke the privilege, and that his mere invocation of the privilege could not, *on its own*, be a ground to disbar him or prevent him from arguing that the documents sought in the subpoena were "private papers" and not subject to production.  *Id.* at 519.  In other words, as in *Traficant*, the limits on admissibility at trial needed to be narrowly tailored to "the matter" about which the attorney refused to testify.  This analysis keeps with the Supreme Court's later reasoning in *Mitchell v. United States*, 526 U.S. 314, 328 (1999), in which it explained, "This Court has recognized 'the prevailing rule that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them,' *Baxter v. Palmigiano*, 425 U.S. 308, 318 [] (1976), at least where refusal to waive the privilege does not lead 'automatically and without more to [the] imposition of sanctions,' *Lefkowitz v. Cunningham*, 431 U.S. 801, 808, n. 5 [] (1977)."

Here, although the Court has serious questions about the Affidavit of Good Cause which accompanied the government's initial complaint,[6] Rahman did not move to dismiss the complaint on that basis, and instead participated in discovery. Thus, it appears that Rahman was questioned about his naturalization only after the government first came forward with evidence (albeit evidence *not* referenced in its Affidavit of Good Cause) that raised serious questions as to whether he had unlawfully procured his naturalization: Miah's and Uddin's A-Files contain immigration forms in their names, but which bear Rahman's fingerprints; forms in

---

[6] The government filed as an exhibit to its complaint an "Affidavit of Good Cause" in which Nguyen purported to "declare under penalty of perjury" that "DHS records establish that the person who naturalized as Humayun Kabir Rahman was previously ordered excluded under the name Ganu Miah, and previously ordered deported under the name Shafi Uddin." (ECF No. 1-1, PageID.23). However, Nguyen makes no reference in her Affidavit to the fingerprints or photos that the government now contends support its case, and it is unclear how Nguyen reached her conclusions. (*Id.*). For example, without offering any explanation whatsoever, Nguyen goes from discussing "the individual" who arrived in the United States under the name "Ganu Miah," to simply referring to this individual as "Rahman." (*Id.*, PageID.23). Nguyen did the same when discussing "Shafi Uddin's" application history. (*Id.*, PageID.25-26). It is thus at best unclear what *evidence* Nguyen relied on for her principal conclusion. *See U.S. v. Zucca*, 351 U.S. 91, 98-99 (1956) ("The complaint, under modern practice, is required merely to allege ultimate facts while the [A]ffidavit [of Good Cause] must set forth evidentiary matters showing good cause for cancellation of citizenship."). Although Rahman, in his amended answer to the complaint, specifically avers that, "The Affidavit of Good Cause is Insufficient to [sic] Support the Complaint," he did not move to dismiss the case on that basis, *compare*, *Zucca*, 351 U.S. 91; *see also U.S. v. Failla*, 164 F.Supp. 307 (D.N.J. 1957), and did not meaningfully address it in his summary judgment filings. (ECF No. 14, PageID.109). The closest he came was a single sentence towards the very end (fourth to last sentence) of his own summary judgment motion where he wrote, "the government fails [on its argument that Rahman was not eligible for permanent residency] because the only basis for that statement ***in the Affidavit of Good Cause*** is that the affiant wrote it there." (ECF No. 28, PageID.227-28) (emphasis added). But, even assuming this argument has not been waived, *see e.g.*, *Failla*, 164 F.Supp. at 312-13; *Lucchese v. United States*, 356 U.S. 256 (1958), it was not presented in a sufficiently detailed manner, nor was it sufficiently tied to any of the standards relevant to the parties' instant motions, for the Court to consider it as a basis for granting Rahman any relief at this time.

the A-Files contain other information, such as common addresses and names of relatives; and, photographs associated with the three men show that they "share multiple facial features, including the overall shape of the face, the shape of the profile, hairline, eyes, eyebrows, nose, lips, chin, and specific structures in the ears" which "lend strong support" for all three men "being the same individual."

Armed with that evidence, the government had a right to question Rahman in this civil action about those matters, and, *depending on the questions put to him*, his refusal to provide answers may contribute to the government's evidence against him. *See United States v. Balsys*, 119 F.3d 122, 136 (2d Cir. 1997), *rev'd* on other grounds, 524 U.S. 666 (1998) ("Invoking the privilege in the face of incriminating questions is probably not, *by itself*, sufficient to justify depriving a person of an important liberty interest.  [] And freedom from deportation is such an interest.  []  But if there is other evidence, the witness's silence may contribute to a decision to deport the alien.") (emphasis in original) (internal citations omitted); *Stelmokas*, 100 F.3d 302, 311 (3d Cir. 1996) (stating that adverse inferences could be drawn in a denaturalization proceeding against an alleged Nazi collaborator from fact that he invoked his privilege against self-incrimination "as long as there was independent evidence to support the negative inferences beyond the invocation of the privilege against self-incrimination").

In sum, if the government had no other evidence to support its position that

35

Rahman lied in connection with his naturalization application, Rahman's invocation of the Fifth Amendment might not warrant imposition of an adverse inference. But here, where, at the time of Rahman's deposition, the government possessed the aforementioned evidence which at least raises serious questions about whether Rahman lied during his naturalization process, Rahman's refusal to answer questions **about that evidence** could warrant an adverse inference that his truthful answers to those questions would have supported the government's case, and could prevent him from presenting his own evidence on those particular "matter[s]." *Traficant*, 884 F.2d at 265.

While most of the above analysis is helpful to the government, not Rahman, the courts' overall focus on narrowly tailoring the admissibility limits to the "matters" about which the litigant was questioned helps Rahman because the main discovery questions on which the government's summary judgment motion rests were not directed to the *specific evidence* it had against Rahman. Instead, its salient questions were so broadly worded that Rahman's refusal to answer them cannot compel the main inference urged by the government – that Rahman, "Ganu Miah," and "Shafi Uddin" are one and the same person.

## III.    ANALYSIS

### A.    The Government's Summary Judgment Motion

The gist of government's theory is that Rahman lied during his naturalization

process when he denied having previously (1) "given false or misleading information to any U.S. government official while applying for any immigration benefit or to prevent deportation, exclusion, or removal" and (2) "been ordered to be removed, excluded, or deported from the United States" because he had, in fact, previously applied for immigration benefits as Ganu Miah and as Shafi Uddin, who had been ordered excluded and/or deported.

Upon filing this case, the government's evidence consisted of the information in the three A-Files, including the various fingerprints and the photographs contained therein, and Wagner's first report concluding that the fingerprints he analyzed were "made by the same individual."  At least in its summary judgment motion, however, the government does not contend that this or any of its own other evidence (*e.g.*, Wagner' second report and Meline's report), standing alone, is enough to satisfy its heavy burden of establishing by "clear, unequivocal, and convincing" evidence, *Fedorenko*, 449 U.S. at 505, that Rahman lied during his naturalization process. Accordingly, the Court will not address that discrete issue.[7]

The government, understandably, set out to use the discovery process to shore up its case against Rahman, principally by serving interrogatories on him and taking

---

[7] The Court notes, however, that during the time in question, the "INS did not verify that fingerprints submitted by applicants for naturalization and permanent residency actually belonged to aliens who submitted them."  (ECF No. 28-6, PageID.267).

his deposition.  But, instead of directly asking Rahman if he submitted the Ganu Miah application, or if he submitted the Shafi Uddin application,[8] or any of the untold number of other direct questions it could have asked him about the potentially dispositive evidence[9] it possessed, it asked him questions like this one at his deposition (which only lasted roughly **one hour in total**):

> Q.   Have you ever given false or misleading information to any U.S. government official while applying for any immigration benefit or to prevent deportation, exclusion or removal?

(ECF No. 29-52, PageID.696).

Similarly, in what appears to be an attempt to address the central "identity" issue in this case, the government asked Rahman to answer the following interrogatories: "Identify all names and aliases that you have used for any purpose at any time" and "State and describe in detail each occurrence where you have given false or misleading information to any official of the United States government while applying for any immigration benefit or to prevent deportation, exclusion, or removal."  (ECF No. 29-52, PageID.767, 770).  Rahman refused to answer these,

---

[8] The government did not even mark the Miah or Uddin asylum applications – which form the backbone of its entire case –as exhibits at Rahman's deposition.

[9] The Court recognizes that a small minority of the government's questions were tied to specific evidence in the government's possession, such as when it asked him to identify which of various photographs were of him.  (ECF No. 29-58, PageID.771).  While Rahman's refusal to answer questions on those issues may be damning to his overall defense, the Court is disinclined to grant the government's summary judgment motion based on that evidence when the central question in this case – whether Rahman submitted the Miah and/or Uddin applications – was not asked.

and many other of the government's questions, invoking his Fifth Amendment right. Consequently, the government asks the Court to (1) find that he is prohibited from offering evidence to contradict the government's evidence that he, Miah, and Uddin are "one and the same person," and (2) impose an adverse inference to that effect.

At least on the present record, the Court declines to do so. The stakes are exceedingly high in this case, with Rahman's naturalized citizenship on the line. Accordingly, the law imposes an equally high and exacting standard of proof on the government to justify revoking that citizenship – "clear, unequivocal, and convincing" evidence must be presented. *Fedorenko*, 449 U.S. at 505. In addition, not only must the Court construe the evidence in the light most favorable to Rahman as to the government's summary judgment motion, but because the government has the burden of persuasion in this case, it faces a "substantially higher hurdle" than Rahman does with respect to his competing motion. *Arnett*, 281 F.3d at 561.

In light of these exacting standards, and the case law discussed above, *supra* at 15-36, the Court simply cannot say that the government's evidence and its questions to Rahman sufficiently line up such that his refusal to answer them clearly, unequivocally, and convincingly establishes that the government is entitled to a judgment in its favor. The central issue in this case is not whether Rahman *ever* used *any* alias, but whether he submitted the Ganu Miah and/or Shafi Uddin applications. Nor is the issue whether Rahman has *ever* given false or misleading information to

an immigration official.  Rather, the issue is whether he had done so prior to the time he made that representation in his Form N-400 and during his subsequent naturalization interview.[10]

Moreover, the adverse inference that the government asks the Court to draw appears inconsistent with Rahman's denials in his amended answer to the government's complaint.  For example, Rahman denied: (1) providing a sworn statement to immigration officials that "that the passport [he held] did not belong to him and that his true name was Ganu Miah"; (2) that on February 19, 1998, "an immigration judge ordered [him, in the name of Ganu Miah] excluded and deported"; and (3) that "On or about October 11, 1994, [he] applied for asylum under the name Shafi Uddin."  (ECF No. 1; ECF No. 14).  The government's questions during discovery failed to flesh out details regarding these and other denials by Rahman.  Given the broad-brush questions the government asked Rahman, and the many obvious questions it did not ask, its failure to obtain those details cannot necessarily be pinned on Rahman's invocation of the Fifth Amendment.

---

[10] The government contends that Rahman "cannot dispute that he testified falsely at his naturalization interview."  (ECF No. 29, PageID.298).  But it makes this claim based on faulty logic.  It claims, "Officer [Simion] Catau testified that Defendant provided answers under oath consistent with what was written on the Form N-400.  [] When asked these same questions at his own deposition, [Rahman] asserted his Fifth Amendment right against self-incrimination."  (*Id.*).  The problem is that a question today about whether Rahman has "ever" done something is not "the same" as an identical question asked of him many years earlier.  While the point the government seeks to make with its questions is not lost on the Court, given the exacting burdens that apply here, details like these matter greatly, particularly to the application of the adverse inference principle on which the government's summary judgment motion largely rests.

Rahman's amended answer raised other questions that were also not fleshed out during discovery.  For instance, although he denied having "applied for asylum under the name Shafi Uddin" and having "submitted a Form G-325A" in support of that application, Rahman refused to answer the next allegation that, "On the Form G-325A, [he] stated that his name was Shafi Uddin . . ." (*Id.*).  While this particular refusal to answer could arguably warrant the imposition of an adverse inference, the Court will not do so where, overall, Rahman's amended answer denials left significant room for the government to build a clear record on the salient issues through tailored direct questions, but simply failed to do so.

For all of the foregoing reasons, the government has not satisfied the heightened and exacting burdens required for it to show that it is entitled to summary judgment.

### B.    Rahman's Summary Judgment Motion

At the same time, the government's failure to ask the questions necessary for an adverse inference to be applied is not a fatal shortcoming as to the merits of its claims against Rahman.  It remains that the government has presented evidence which is consistent with Rahman having submitted the Miah and Uddin asylum applications.  Miah's and Uddin's A-Files contain immigration forms in their names, but which bear Rahman's fingerprints.  The forms in the A-Files contain other information, such as common addresses and names of relatives. *See supra* at 9-12.

The government also has presented photographic evidence, and Meline's expert report, which tend to support its claims. *See* supra at 12-13. The government's evidence thus raises factual questions that it may properly question Rahman about at trial, and the Court leaves open the possibility of imposing an appropriate adverse inference against Rahman depending on the government's questions and Rahman's answers.[11] And, of course, Rahman may have questions of his own regarding the government's evidence, and may be able to present his own evidence as to the issues in dispute, though as discussed above, *see supra* at 30-36, his ability to do so may be limited depending on the government's questions and his answers.

Other arguments Rahman raises do not change the analysis. For example, he claims that "[t]he A files [Nguyen] examined contained applications that the subjects applied for but did not contain fingerprint cards or pictures of the subjects when Nguyen examined the files." (ECF No. 28, PageID.211). However, Rahman cites Page 23 of Nguyen's deposition for this purported fact, and a review of that transcript page simply does not bear out Rahman's assertion. (ECF No. 28-2, PageID.244). In response to counsel's question, "What's contained in the A-file?", Nguyen responded, "The applicant's immigration history . . . Any type of forms or applications that he applied for." (*Id.*). There was no specific question put to her

---

[11] It is the existence of this evidence that would, depending on the questions and answers, potentially allow the imposition of an adverse inference. *Stelmokas*, 100 F.3d at 311; *Balsys*, 119 F.3d at 136; *Baxter*, 425 U.S. at 318. *See also supra* at 33-36.

about whether the A-files contained fingerprints or photos. (*Id.*). At most, when pressed for additional details about "[w]hat else would be contained in the A-file," Nguyen simply answered, "I don't remember." (*Id.*).

Citing government reports of lax standards employed with respect to the INS' receipt of fingerprints during the mid-1990's, Rahman argues that the Ganu Miah and Shafi Uddin "fingerprint cards" "are inherently unreliable." (ECF No. 28, PageID.213). From that, Rahman hypothesizes, "[t]herefore, the possibility that extra fingerprint cards belonging to Rahman could have been used by Miah and Uddin without Rahman's knowledge." (*Id.*, PageID.214). While Rahman raises valid questions about the fingerprints' reliability, *see supra* at 37 n.7, and the speculative "possibility" he raises is not (particularly viewed in isolation) implausible, those issues go to the weight to be given that evidence as it is weighed against all of the other evidence in this case. The Court cautions, however, that the government need not "disprove every negative hypothesis beyond a reasonable doubt" to prevail in this case. *Son*, 2010 WL 1460230, at *3.

Rahman also argues that "[t]he alleged misrepresentations [he is accused of making]are not material because they would not have affected the decision regarding naturalization." (ECF No. 28, PageID.223). However, the person who conducted Rahman's naturalization interview, Officer Simion Catau, averred in his affidavit, "Had Mr. Rahman informed me that he had used a different name that was not

disclosed on the application, I would have asked additional questions regarding the use of the other name, seeking to determine if it impacted his eligibility to naturalize . . . Had Mr. Rahman informed me that he had been detained by INS in secondary inspection upon his initial arrival in the United States, I would have made further inquiries to determine what followed, including whether removal or exclusion proceedings were initiated . . . Had these inquiries revealed that Mr. Rahman had used multiple identities to apply for immigration benefits, I would have denied his application under 8 C.F.R. § 316.10(b)(2)(vi), and placed him in removal proceedings. . . . Had Mr. Rahman informed me that he had given false or misleading information to any U.S. government official while applying for any immigration benefit or to prevent deportation, exclusion, or removal, I would have denied his application under 8 U.S.C. § 1429, INA § 318."  (ECF No. 29-51, PageID.677). Clearly, at a minimum, this evidence raises questions that show Rahman is not entitled to summary judgment on this argument.

Finally, Rahman raises another issue with respect to Officer Catau.  (ECF No. 32, PageID.817).  In his affidavit, Officer Catau made a series of statements that began, "I orally asked Mr. Rahman . . . ," with each statement then referencing a specific aspect of his Form N-400.  (ECF No. 29-51, PageID.675-76).  For instance, in Paragraph 8, Catau avers, "I orally asked Mr. Rahman the question in Part I, Section A, his current legal name, and he stated his current legal name was Md

44

Humayun Kabir Talukder." (*Id.*, PageID.675). Paragraphs 8, 9, 10, 12, and 13 all contain this exact verbiage, addressed to different portions of Rahman's Form N-400. (*Id.*, PageID.675-76). However, Paragraph 11 reads, "I orally asked ***Mr. Khan*** the question in Part 10, Section D, Question 23 . . ." (*Id.*, PageID.676) (emphasis added). At deposition, Rahman's counsel questioned Catau about his affidavit, asking him if everything contained therein "was true and correct." (ECF No. 32-2). Catau answered that it was. (*Id.*). Later during questioning, the reference to "Khan" was brought to Catau's attention by the government's counsel, and, upon it being highlighted for him, he testified it was a typographical error. (ECF No. 32-5).

Rahman now contends, "[t]he logical conclusions to this are several. Either Catau (1) lied under oath and perjured himself in signing the declaration containing false information, or, (2) he perjured himself in his first answer to the deposition stating Khan was a name given to him by Rahman, or (3) Catau perjured himself when he agreed with Plaintiff's counsel that Khan was a typographical error." (ECF No. 32, PageID.817). Rahman's argument fails. Given that in this entire case, the only reference in *any* of the voluminous documents before the Court that has the name "Khan" in it is the one stray reference in Catau's affidavit which he testified was a typographical error, there exists a much less sinister, and a much more "logical conclusion": that Catau's affidavit's reference to "Khan" was a typographical error that Catau did not catch in his review. Rahman is free to argue that this grain of

45

evidence impacts the weight the Court should give Catau's testimony, but it is not a basis for its wholesale rejection.

For all of these reasons, Rahman has not shown he is entitled to summary judgment in his favor at this time.

## IV.   CONCLUSION

For all of the reasons stated above, **IT IS ORDERED** that Rahman's motion for summary judgment **(ECF No. 28) IS DENIED** and that the government's motion for summary judgment **(ECF No. 29) IS DENIED**.

Dated: April 20, 2020                                    s/David R. Grand
Ann Arbor, Michigan                                 DAVID R. GRAND
                                                              United States Magistrate Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on April 20, 2020.

                                                              s/Eddrey O. Butts
                                                              EDDREY O. BUTTS
                                                              Case Manager